# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
2019 OCT -4 AM 10:51
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 3:19mj598
IN THE MATTER OF THE SEARCH OF A CELLULAR )
TELEPHONE ASSIGNED CALL NUMBER (937) 541-9799 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A. This court has authority to issue this warrant under 18 U.S.C. sections 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the ___unknown___ District of ___unknown___, there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Conspiracy to possess with intent to distribute a controlled substance |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Ryan Fergot, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/4/19

_____
*Judge's signature*

City and state: Dayton, Ohio    Michael J. Newman, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (937) 541-9799 | Case No. _____ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Ryan M. Fergot, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of a cellular telephone assigned call number (937) 541-9799, with a subscriber listed as Elisa Smith and address of 101 Salem Avenue, Dayton, Ohio (hereinafter referred to as "**Target Telephone**"), whose service provider is T-Mobile, a wireless telephone service provider. The **Target Telephone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent with the United States Drug Enforcement Administration (DEA), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878. The information contained in this Affidavit is either personally known by me or relayed to me by other law enforcement officers involved in this investigation. I have been employed as a Special Agent (SA) with the DEA since September 2018. In September 2018, I attended the DEA Academy which consisted of 17 weeks of training in conducting federal drug trafficking investigations; handling confidential sources; conducting undercover operations; conducting mobile, static, foot and electronic surveillance; conducting tactical entry and vehicle

arrest operations; using defensive tactics and firearms; as well as additional aspects of conducting DEA lead investigations. I have been assigned to the DEA Dayton Resident Office since April 2019. Prior to employment with the DEA, I was a sworn Law Enforcement Officer of the State of Wisconsin who was charged with the duty to investigate criminal activity and enforce the criminal laws of the State of Wisconsin, and employed by the City of Appleton Police Department from August 2014 to September 2018. During my employment with the Appleton Police Department, I was assigned to the Department's patrol division. During my time as a patrol officer, I conducted retail level drug investigations and I assisted the Appleton Police Department's Community Resource Unit (CRU) which included Narcotics Investigations, Prostitution and Pimping, Human Trafficking, and Criminal Street Gangs.

3. Since the time of my assignment with the DEA, and during time spent as an Appleton Police Officer, I have been involved in narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics, and participated in undercover narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution of controlled substances often operate. These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived.

4. Through training and experience, I am aware that drug traffickers often communicate with their customers, couriers, and/or associates through the use of standard hardline telephones, cellular telephones and digital display paging devices, or use of multiple telephones or other devices, to avoid detection by law enforcement.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter nor all the facts known to investigators.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 (possession with the intent to distribute and to distribute a controlled substance and conspiracy to commit the same); and 21 U.S.C. § 843(b) (use of a communications facility to commit a felony) have been committed, are being committed, and will be committed by an individual utilizing the **Target Telephone**. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

7. I submit, based on the facts below, that there is probable cause to believe that the **Target Telephone**, as described above, is being utilized by Eduardo FITCH, who is a member of a Drug Trafficking Organization (DTO) operating in the Dayton, Ohio area.

8. On June 12, 2019, members of the DEA Dayton Resident Office (DRO) conducted a debrief with a Cooperating Defendant (hereinafter CD1).[1] During the debrief, CD1 provided information about the drug trafficking activities of Eduardo FITCH. CD1 stated that FITCH is a kilogram level fentanyl distributor. CD1 provided the cellular telephone number (213) 923-2424 as the number used by FITCH.

9. On June 12, 2019, CD1 stated that s/he had been hanging out with FITCH on the evening of June 11 to 12, 2019. CD1 stated that FITCH had left the hotel to go out and had been arrested for Driving Under the Influence, but was released form the scene. CD1 stated that FITCH contacted CD1 on the morning of June 12, 2019 and told CD1 that there was some fentanyl in a bag at the hotel room. CD1 stated that FITCH asked CD1 to hold on to the bag and

---

[1] In June 2019, CD1 was arrested on drug charges. CD1 assisted law enforcement for consideration on these charges.

FITCH would call CD1 back to determine a time and place for CD1 to return the bag. CD1 agreed to hold on to the bag, knowing that there was fentanyl in the bag.

10. On June 12, 2019, CD1 conducted a recorded telephone call in the presence of members of DRO. CD1 spoke with FITCH on the cellular telephone number (213) 923-2424. The following transcription starts at approximately three (3) minutes 28 seconds into the recorded call:

**SOI:** . . . you want to link up?

**FITCH:** I don't even have a car bro. I can't get my car until tomorrow.

**SOI:** You're lucky you didn't take that fuckin bag with you nigga, you woulda went down smoking.

**FITCH:** Say what?

**SOI:** Said, you're lucky you didn't have that shit withyou, you woulda went down smoking.

**FITCH:** Wait, what? What do you mean? . . .Oh I know bro, that was my first thought bro. I was like oh my gosh. . . Hey, you wanna know what's funny though?

**SOI:** What?

**FITCH:** On my zipper.

**SOI:** Yeah

**FITCH:** I still had that (unintelligible)

**SOI:** Ah, that shit you tucked back in your zipper last night, I forgot about that fucking shit dude.

**FITCH:** Yeah Bro. I still had it in the morning.

**SOI:** You mother fucker.

**FITCH:** (Laughing in the background)

**SOI:** You slick. You lucky as fuck, for real.

**FITCH:** I have no idea how that happened bro.

**SOI:** God had your back.

**FITCH:** Hmm?

**SOI:** God got your back.

**FITCH:** N, yeah bro... you got any money for me?

**SOI:** (unintelligible) I haven't even sold none bro, I was honestly just wakin' up. I haven't done shit.

**FITCH:** Hmm...

...

11. CD1 stated that in in 2018, CD1 stored ten (10) kilograms of fentanyl in the attic of a relative's house for FITCH without the relative's knowledge. CD1 stated the drugs were removed once the relative became aware of their existence.

12. CD1 stated that in October 2018, CD1 met FITCH to give FITCH a ride and FITCH gave CD1 two (2) pounds of fentanyl to sell. CD1 stated, s/he overdosed on the fentanyl while attempting to make the fentayl ready for resale. CD1 stated that FITCH removed the fentanyl from the location prior to first responders arriving to the scene of the overdose.

13. On or about June 13, 2019, members of the DRO received call detail records from Sprint for the cellular telephone number of (213) 923-2424. Members of the DRO conducted telephone toll analysis and observed the cellular telephone number of (213) 923-2424 was in contact with CD1's phone number on approximately 157 occasions between June 5, 2019 and June 11, 2019.

14. On June 18, 2019, a search warrant was applied for in regards to actively tracking the location of cellular telephone number of (213) 923-2424. The search warrant was granted by United States Magistrate Judge Michael Newman. On the same date, the search warrant was executed on cellular telephone number (213) 923-2424. Investigators from the DRO were

informed by Sprint that the phone number (213) 923-2424 was no longer an active number. Investigators from DRO were advised that the phone number was deactivated on June 14, 2019.

15. Once it was determined the cellular telephone number of (213) 923-2424 was no longer being utilized by FITCH, investigators began the process of tracking down the new cellular telephone FITCH was utilizing. On June 23, 2019, investigators utilized open source intelligence and found a current Facebook page belived to be utilized by FITCH. The Facebook page was listed as having the profile name of "Fitch Framing." The profile picture depicted FITCH with his known girlfriend, who shall be referred to for purposes of this affidavit as A.M. DRO investigators reached out to a reliable confidential source, (herinafter referred to as "CS").[2] The CS was informed by DRO investigators of a desire to obtain a new cellular telephone number for FITCH. The CS agreed to assist investigators with trying to obtain the currenct cellular telephone being utilized by FITCH. The CS was able to make contact with FITCH through the Facebook Profile "Fitch Framing".

16. On June 24, 2019, the CS stated FITCH responed to the CS on Facebook. The CS provided FITCH with a cellular number and requested that FITCH call the CS. FITCH contacted the CS utilizing (937) 603-3151. The calls and text messages between the FITCH and the CS were recorded and monitored by invstigators. During a text message thread between the CS and FITCH, the CS received a text message that said "It's Eduardo". A short time later FITCH placed a call to the CS utilizing (937) 603-3151. In the conversation, FITCH told the CS to meet him in Piqua, Ohio. DRO investigators monitored the phone call while it was being conducted and recognized the voice as being that of FITCH. The CS then traveled to the location

---

[2] The CS has a criminal history that includes convictions for assault, domestic violence, drug trafficking, and engaging in a pattern of corrupt activity. The CS is currently working for financial gain. CS has provided reliable and credible information on past investigations. The CS is being corroborated by recorded telephone calls.

described by FITCH and met with him.

17. After meeting with FITCH, a debrief was conducted with the CS by DRO investigators. During the debrief, the CS gave positive identification that the individual who contacted the CS utilizing (937) 603-3151, and whom the CS met with in Piqua, was Eduardo FITCH. The CS stated during the meeting with FITCH, discussion occurred about Spencer GOODRICH being arrested for possession of larger amount of illegal drugs, and that FITCH was concerned he (FITCH) was being sought by law enforcement.

18. On September 20, 2019, members of the DRO conducted an interview with a Cooperating Defendant (herein referred to as CD2)[3]. CD2 stated s/he knew Eduardo FITCH and contacted him regularly. CD2 stated FITCH was currently in Mexico and was using the **Target Telephone** even while FITCH was in Mexico. CD2 stated s/he had been in contact with FITCH while FITCH was in Mexico utilizing the **Target Telephone**. CD2 stated FITCH was in Mexico hiding from a warrant that he has in the State of Ohio and that FITCH was setting up a shipment of fentanyl to come to Southwestern Ohio.

19. DRO investigators were able to determine through cellular telephone analysis that **Target Telephone** has been in contact with a Mexican phone number believed to be used by Martin CHAVEZ-Garcia, and a United States based telephone number that is being used by Jose VILLALOBOS.

20. I am currently assisting in an investigation involving multiple jurisdictions receiving heroin and fentanyl from Martin CHAVEZ-Garcia aka "CHANGO". CHAVEZ-Garcia is known to me from past investigations conducted by the DEA Dayton Resident Office (DRO). Specifically in 2010, CHAVEZ-Garcia delivered two kilograms of heroin to a customer in

---

[3] CD2 was under arrest for a warrant and drug possession at the time of the interview. CD2 has prior drug possession charges. CD2 is working with law enforcement in hopes of getting consideration on these charges.

Dayton, Ohio. CHAVEZ-Garcia was subsequently charged and convicted of possession of heroin with intent to distribute, in the United States District Court for the Southern District of Ohio Case Number 3:10CR210(3). CHAVEZ-Garcia was sentenced and later deported to Mexico, as he was unlawfully in the United States at the time of his arrest.

21. Since the time of CHAVEZ-Garcia's arrest, the DRO has interviewed multiple sources of information, and learned that CHAVEZ-Garcia has continued to send heroin to the United States, and specifically to Dayton, Ohio.

22. CD2 stated Jose VILLALOBOS is working with FITCH to traffic drugs in Southwestern Ohio and VILLALOBOS is running the organization in Southwestern Ohio while FITCH is in Mexico.

23. On September 22, 2019, the CS received an incoming call from 956-730-0321 (Phone number belonging to Jose VILLALOBOS), whose voice CS recognized as being Jose VILLALOBOS. This incoming call was monitored and recorded by members of the DRO. The first portion of the conversation was in Spanish and was translated by Task Force Office (TFO) Jorge DelRio, who is fluent in English and Spanish. A synopsis of that portion of the conversation included VILLALOBOS asking the CS if the CS had any "ice." Based on my training and experience, I know that methamphetamine is commonly referred to as "ice." The second portion of the conversation was in English. The CS stated that they did not have any (referring to ice).

VILLALOBOS: My connect is out [referring to the request of "ice"].

CS: Yeah, but I'm let you know [Spanish: homie] when it's up.

VILLALOBOS: Alright.

CS: Hey my boy say he gonna come I think tomorrow or Tuesday for that sample n shit and then buy that shit.

VILLALOBOS: [Spanish] Alright homie . . . . .

24. Based on training and experience, I believe that VILLALOBOS called the CS to find methamphetamine to purchase for resale, due to VILLALOBOS's source of supply being out. The CS told VILLALOBOS the CS did not have any methamphetamine, as well. CS then referenced a previous conversation that occurred earlier this month between the CS, SA Charles Vill and Jose VILLALOBOS, during which SA Vill was working in an undercover capacity. In that previous conversation, Jose VILLALOBOS spoke to SA Charles Vill about an upcoming shipment of an undetermined quantity of fentanyl that was coming into Southwestern Ohio. In the same conversation, SA Charles Vill spoke with Jose VILLALOBOS about purchasing kilogram quantities of fentanyl from Jose VILLALOBOS.

25. On October 1, 2019, DRO investigators were informed that FITCH had crossed the southern border from Mexico into the United States through the San Ysidro, California port of entry.

26. In summary, I believe the **Target Telephone** is currently being used by Eduardo FITCH in the distribution of drugs.

27. On October 2, 2019, a search warrant was applied for in regards to actively tracking the location of the **Target Telephone**. At the time of that application, I believed that Sprint was the service provider for the **Target Telephone**. The search warrant was granted by United States Magistrate Judge Michael J. Newman that same date. Later that day, upon submitting the warrant to Sprint, I learned that the **Target Telephone** was now receiving services from T-Mobile. Therefore, I am seeking this warrant for the new service provider, T-Mobile.

28. The focus of the phone ping would be to track Eduardo FITCH as he travels across the country from the the border crossing point to Southwestern Ohio, identify any locations where he may stop along the trip.

29. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

30. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the **Target Telephone**, including by initiating a signal to determine the location of the **Target Telephone** on Sprint's network or with such other reference points as may be reasonably available.

31. Based on my training and experience, I know that T-Mobile can collect cell-site data about the **Target Telephone**.

### AUTHORIZATION REQUEST

32. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

33. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Telephone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2)

34. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the **Target Telephone** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

35. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Telephone** outside of daytime hours.

36. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Ryan Fergot
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this 4th day of October, 2019.

_____
MICHAEL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## Property to Be Searched

1. A cellular telephone assigned call number, (937) 541-9799, with subscriber listed as Elisa Smith and an address of 101 Salem Avenue, Dayton, Ohio ("**Target Telephone**"), whose wireless service provider is T-Mobile, a company headquartered at Bellevue, WA.

2. Information about the location of the **Target Telephone** that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

# ATTACHMENT B

**Particular Things to be Seized**

All information about the location of the **Target Telephone** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **Target Telephone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the **Target Telephone** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).